HORWITZ v. GULF STATE BANK OF HOUSTON.   (No. 3456.)

Court of Civil Appeals of Texas. Texarkana. Nov. 3, 1927.

Rehearing Denied Dec. 22, 1927.

1. **Corporations** ⟨key⟩121(5)—**Evidence held to support finding that there was no failure of consideration for note for misrepresentations by defendant of value of stock bought with proceeds.**

In action to cancel note given for money with which plaintiff purchased stock in café, and for damages to cover loss in operating café, evidence *held* sufficient to support finding that there was no failure of consideration due to alleged misrepresentations by defendant that stock, which it had held as collateral to secure another loan, was worth par value.

2. **Trial** ⟨key⟩352(4)—**Refusal to submit interrogatories relative to issues not pleaded held not error.**

In action to cancel note on ground that plaintiff was influenced to execute it by misrepresentations of defendant, refusal to submit issues relative to concealment of certain facts by defendant's agent *held* not error, where such concealment was not pleaded as basis of relief sought.

Appeal from District Court, Harris County; Roy F. Campbell, Judge.

Suit by Will Horwitz, Jr., against the Gulf State Bank of Houston. Judgment for defendant, and plaintiff appeals. Affirmed.

John L. Meany and Ewing Werlein, both of Houston, for appellant.

Winfree & Weslow, of Houston, for appellee.

HODGES, J. On October 4, 1924, Will Horwitz, Jr., the appellant, executed and delivered to the Gulf State Bank of Houston his promissory note for the sum of $18,750, payable on demand. The purpose of executing the note was to enable Horwitz to purchase 375 shares of the Milwaukee Café, Incorporated, of Houston. The corporation had been organized a year or more before the note was executed, with a capital stock of $75,000 divided into 750 shares, each of the par value of $100. Prior to its incorporation the café had been owned and operated by William and Barney Scholl. After its incorporation the Scholls owned most of the stock, and continued in the active management of the business. At the time appellant executed his note to the bank the latter held the note of the Scholls for $21,000, secured by 375 shares of the stock of the Milwaukee Café deposited with the bank as collateral. After several conferences between the officers of the bank and Horwitz, the latter bought the stock which had been

placed with the bank, the consideration being $18,750, or 50 per cent. of the par value of the stock. That purchase, together with 10 shares of stock previously owned by Horwitz, gave him a controlling interest, and he soon thereafter took over the exclusive management of the café. For several years prior to the purchase of this stock Horwitz had been a customer of the bank. After assuming control of the café he made considerable improvements in the way. of decorations and furnishings. He also procured an orchestra to furnish music during the meal hours. He continued the operation of the café for three months after assuming control. During that time his expenditures for improvements and maintenance of the orchestra amounted to the sum of $26,373.33. Finding that the business was being conducted at a loss, at the end of three months he closed the café. Some time after it was closed the corporation was adjudged a bankrupt and its assets were sold at public auction for less than $4,000.

This suit was filed by Horwitz against the appellee bank to cancel his note for $18,750 and to recover as damages $26,373.33, the amount he had expended in the way of improvements and maintenance during the time he was conducting the business of the café. He charged that the consideration of the note had failed, and that by reason of the false and fraudulent representations of the bank officials, acting for the bank, he had been induced to buy the stock and make the expenditures alleged. The bank answered by general and special exceptions and general and special denials. It also pleaded, by way of cross-action, the execution of the note, and asked for judgment for principal, interest, and attorney's fees.

The court submitted the following special issues:

(1) "Was there failure of consideration for the note of $18,750 given by plaintiff to the defendant, upon the occasion in question? Answer: No."

(2) "Did Eli Marks represent to plaintiff at and shortly prior to the time of his purchase of the Scholls' stock, in substance, that capital stock of the Milwaukee Café, Incorporated, was worth par or full value? Answer: No."

(Questions 3, 4, 5, and 6 omitted as immaterial.)

(7) "Did Eli Marks turn over to plaintiff certain itemized statements purporting to reflect profits of the Milwaukee Café, Inc., for the months of May, June, July, and September, 1924? Answer: No."

(8) "If you have answered the preceding question in the affirmative, then answer: Were such statements as to profits for such months untrue? Answer: Yes."

(9) "If you have answered the preceding question in the affirmative, then answer: Were such itemized statements turned over to plaintiff as an inducement to plaintiff to execute his

note to the bank and buy the Scholls' stock? Answer: Yes."

(10) "If you have answered the preceding question in the affirmative, then answer: Did the plaintiff believe that said statements reflected the true profits of said Milwaukee Café, Incorporated, for such months? Answer: Yes."

(11) "If you have answered the preceding question 'in the affirmative, then answer: Was the plaintiff induced under such belief to execute said note and buy the Scholls' stock in reliance on such itemized statements? Answer: No."

(12) "If in answer to any of the above issues you have found that Eli Marks made any representations to plaintiff, then answer: Was Eli Marks at such time acting for and in behalf of the defendant in his capacity as vice president thereof, and as an agent and vice president of the defendant? Answer: Yes."

Upon the answers made by the jury a judgment was rendered in favor of the bank on all the issues presented in the pleadings, including a judgment against the appellant for the amount of the note which he sought to have canceled.

The principal contention in this appeal is that the answers of the jury to interrogatories Nos. 1, 2, and 11 were against the great weight of the evidence. The purpose of this suit was to cancel the note for $18,-750 held by the bank and to recover damages in the sum of $26,373.33, the amount expended by Horwitz in making improvements in the café and in furnishing entertainments in its operation. The testimony shows that Horwitz had resided in Houston about 10 years before he purchased the stock involved in this controversy. He was a business man of some experience. There was nothing to indicate that he was below the average in business capacity. He was one of the original stockholders of the Milwaukee Café, and one of its patrons after its incorporation. There is no evidence that he was denied at any time an opportunity to ascertain fully the financial condition of the corporation, or to examine the equipment and furnishings of the café. He knew that the corporation had not paid any dividends on its stock since its organization. He also knew that the corporation was unable to meet its obligations at that time, and that the creditors were willing to settle for 50 cents on the dollar. He knew that the Scholls, who owned the bulk of the stock and who had previously conducted the business, were unable to pay their debts. He also knew that because of the financial condition of the corporation and its indebtedness to the bank it had been operated for several months under the supervision of Schwartz, the vice president of the bank. In short, he knew before his purchase that the Milwaukee Café was in an unsatisfactory financial condition, and that its debts could be settled at one-half their face value and its stock could be purchased for 50 per cent. of its par value.

In his negotiations for the stock Horwitz talked with Cage, the president of the bank, and with Schwartz and Marks, who were vice presidents. According to Horwitz's testimony most of his talks on the subject of purchasing the stock were with Marks. The substance of his testimony is as follows: His purchase of the stock was the result of several interviews with the bank officials during several weeks immediately prior to October 4. Marks, the vice president, told him that the bank held a note of Scholl Bros. which was secured by 375 shares of Milwaukee Café stock which had been deposited with the bank as collateral. Marks represented the stock as being good security and as worth par value. He said the furniture and fixtures of the café were worth $75,000; that soon after the bank took over the supervision of the café it had been operated at a profit, except one month. He agreed to sell Horwitz 50 per cent. of the stock of the corporation for $18,750, saying that he (Marks) was sure that if appellant would take over the operation of the café the business could be made a greater success than had been made under the supervision of the bank. Appellant offered in evidence a financial statement presented to him by Marks, which showed net profits during the preceding five months aggregating $2,223.14. Appellant further testified that Marks said the management of the Scholls had not been good; that they were incompetent, and suggested that witness could use an orchestra then employed at one of the moving picture shows to furnish music at meal times; and that this added attraction would increase the profits of the café. These and similar representations, witness stated, induced him to execute the note before mentioned and buy the 375 shares of stock.

[1] The bank officials Cage, Schwartz, and Marks testified at some length. Cage testified as follows:

"I recall a conversation between Mr. Horwitz, Mr. Schwartz, myself, and Mr. Marks with reference to the purchase by Mr. Horwitz of the stock in the Milwaukee Café, Incorporated, and about the bank financing the transaction. * * * I never heard Mr. Schwartz around the 1st of October of 1924 ask Mr. Horwitz to buy the Scholl Bros.' stock. During the time this matter was being considered I had an occasion to talk to Mr. Horwitz at my desk in the bank. At that time, when I had the conversation with Mr. Horwitz. I advised him not to do it, and he insisted that he ought to buy it. During the month of October, 1924, the finance committee of the Gulf State Bank was composed of myself, Mr. Schwartz, and Mr. Marks. The finance committee passes on and recommends the extension of credit and making of loans. * * * At that time the finance committee discussed Mr. Horwitz's line they had with reference to the purchase of this stock. The attitude of the finance committee with reference to the purchase of this stock we were re-

luctant to it. I think the committee told Mr. Horwitz so."

On cross-examination appellant admitted that Cage had advised him against buying the stock, but he further stated that Schwartz and Marks advised to the contrary. Schwartz testified as follows:

"I know about Mr. Horwitz purchasing part of the Scholl Bros.' stock in October of 1924. I was present at several conferences between Mr. Horwitz and Mr. Marks, and overheard others. * * * In detail the conferences between Mr. Horwitz, Mr. Marks, and myself occurred and started like this: Probably two months before Mr. Horwitz took possession of that café he, being a stockholder in the original business, took it on his mind he would make a big success of that concern. Scholl Bros. were not making any profit, and he came to us and wanted to buy the stock of Scholl Bros., knowing we held their stock in security for a loan they had with us, and in the first conference we assured him that we did not think he would be the right man to handle the café, not having any experience, and also the fact that Mr. Horwitz was a good customer of the bank at that time, and I was present at several conferences trying to handle his affairs for him. He asked Mr. Marks about his investments, and we often advised him what to do with the surplus money he would have in his account, and he bought several lines of stock that we suggested he buy for investment. And when he approached us about the café, we urged him not to go into it; that it was not the proper line of business, especially when he had his hands full with his theaters; and he seemed like he was peeved, and he took it on his mind that he still wanted to buy the café. And after the conference with him and showing him the causes why he should not handle it, we again persuaded him not to buy it or take it. Those conferences occurred when he came in to make deposits in the bank from the theaters. And at a later conference he insisted if we did not sell him the stock in that café he was going into that business, and he would rent a building, and that he was fully determined to go into that line of business, and knew he would make a lot of money, and it would be profitable to take it on. And after our committee had a conference and saw we could not prevent him taking it, we consented to have Mr. Scholl sell him sufficient stock of the Milwaukee Café to have the controlling interest. His ideas about the success of that business was that he wanted to revolutionize that kind of business and put a cabaret in and make it attractive by having entertainment in addition to the eating features. * * * We finally determined, after we found we could not keep him from it, to let him go ahead. He bought the stock from the Scholl Bros. in the Gulf State Bank. He paid for the stock by giving Scholl Bros. a check for the amount, and he placed that stock and the note as security in the bank. He borrowed the money from our bank and gave Scholl Bros. a check for the stock. I don't think Mr. Horwitz stayed in the Milwaukee for over about 60 days. He put in the improvements he contemplated before he bought the stock. He agreed with us when he took it over that he would not spend probably to exceed $5,000 to make certain improvements; but

it proved to be much greater. * * * I think he went North or West and brought a revue down, a bunch of women that performed in the aisles of the show for a few nights, and it did not prove a success, and they left there, and he had an orchestra to play at the meals. * * * It is my opinion that many men of café experience could have handled the business without difficulty if Mr. Horwitz had not added the expense in the way of music and other expenses. The failure of the café under Mr. Horwitz's management was due to expenditures and overhead and his lack of ability to handle it."

Marks testified, in substance, to the same effect. He further stated that in his opinion the stock was worth 50 cents on the dollar at the time it was purchased by Horwitz, and that the failure of Horwitz to make a success of the café operation was due to his inexperience in that line of business.

The testimony of Cage, Schwartz, and Marks is, we think, amply sufficient to support the findings of the jury. According to evidence offered by the appellee, the note was executed in consideration of a loan. The testimony showed that after the execution of the note the amount of it was placed on the books of the bank to the credit of Horwitz; that he purchased the stock from the Scholl Bros. by giving them his check on the bank in payment. That check was presented to and accepted by the bank, and that amount of money was credited on the note of the Scholl Bros. then held by the bank.

[2] Appellant formulated and presented 42 interrogatories which he requested the court to submit to the jury. Some of them were practically the same as those which the court did submit. He assigns error to the refusal of the court to submit several interrogatories in which the jury were asked to find whether or not appellant had been influenced by concealment of certain facts by Marks. The refusal to submit such issues is justified upon the ground that concealment by Marks, or any other bank official, of important facts, was not pleaded as a basis of the relief sought. The evidence does not disclose any legal relationship between the bank officials and Horwitz other than seller and buyer, and banker and customer. There is nothing in the testimony to justify the inference that Horwitz did not have full opportunity to ascertain, if he desired to do so, every material fact upon which his purchase was based.

Appellant testified that Marks represented to him that the corporation had a lease on the building occupied by the café. He learned after he had made the purchase that it did not have such a lease. The facts show that there was a lease on the building, but it was in the name of Scholl Bros. and was being held by them for the benefit of the café. It further appears from the undisputed testimony that the use and occupancy of the building by the café after it passed

under the control of the appellant was not disturbed in any way. The character of the lease had nothing to do with closing the café, or its failure. It is apparently undisputed that he closed the café and abandoned the business because its operation had proved unprofitable.

The judgment will therefore be affirmed.